Usha **VAKHARIA, M.D.,** Plaintiff,

v.

**SWEDISH COVENANT HOSPITAL,**
et al., **Defendants.**

No. 90 C 6548.

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 18, 1997.

Cyriac D. Kappil, River Forest, IL, Allen E. Shoenberger, Chicago, IL, John F. O'Meara, Chicago, IL, for Plaintiff.

Usha Vakharia, Northbrook, IL, pro se.

Keith A. Dorman, Ross & Hardies, P.C., Chicago, IL, Douglas Wm. Godfrey, Komie & Associates, Chicago, IL, Laurence H. Lenz, Jr., Edwin Earl Brooks, Laura Ruth Keidan, Paul A. Haskins, Katten, Munchin & Zavis, Chicago, IL, Stuart J. Garbutt, Bates, Meckler, Bulger & Tilson, Chicago, IL, for Defendants Demetrius A. Trakas, M.D., Michael J. Plunkett, M.D., Loren Dardi, M.D., Johanna Chookaszian, M.D., Marshall S. Salkin, M.D., Walten I Baba, M.D., Alvin Somberg, M.D., Paul R. Larson, M.D., Roberto Espinosa, M.D., S. Yelda, M.D., M. Barry Kirschenbaum, M.D., G. Christopoulos, M.D.

Laurence H. Lenz, Jr., Katten, Muchin & Zarvis, Chicago, IL, Scott T. Kragie, Squire, Sanders & Dempsey, Washington, DC, Joy L. Langford, Chadbourne & Parke, Washington, DC, for Defendants American Society of Anesthesiologists.

Laurence H. Lenz, Jr., Laura Ruth Keidan, Paul A. Haskins, Katten, Muchin & Zavis, Chicago, IL, for Defendants B. Adrian Kesala, Charles Mudd, Derek Kelly, Raymond Desrosiers, Bharat Shah, Howard Konowitz, James B. McCormick, Arthur R. Peterson, Edward A. Cucci, Judith Borenstein,

Alan Rogin, Jerrold Shapiro, Joseph D'Silva, Miguel Oviedo, Gary Melnick, Tun Myint, Richard Swedberg, Craig E. Anderson, Isolde Anderson, Robert E. Edlen, Milton B. Engebretson, Myrtle A. Erickson, Paul E. Larson.

Laurence H. Lenz, Jr., Laura Ruth Keidan, Paul A. Haskins, Katten, Muchin & Zavis, Chicago, IL, Scott T. Kragie, Squire, Sanders & Dempsey, Washington, DC, Joy L. Langford, Chadbourne & Parke, Washington, DC, for Defendants Charles Vacanti, Ronald H. Wender.

## MEMORANDUM AND ORDER

MORAN, Senior District Judge.

In this pleading and discovery war plaintiff first filed a complaint of four counts. It ultimately expanded to a 50–page complaint with seven counts. The various claims were then the subject of several motions and opinions. We believe the pending claims resulting from that skirmishing are as follows:

Count I, a Title VII claim against Swedish Covenant Hospital (SCH).

Count II, § 1981 claims against SCH and Dr. Loeber relating to the formation of contracts with patients.

Count III, ADEA claims against SCH.

Count IV, breach of contract through violation of the Medical Staff Bylaws, a claim against SCH.

Count V, § 1981 and § 1985 claims against SCH, Dr. Loeber, Dr. Chookaszian, and certain named Board members.

Count VI, a Sherman Act, § 1 claim against SCH, the American Society of Anesthesiologists (ASA), Dr. Vacanti, Dr. Blancato, Dr. Wender, Dr. Loeber, Dr. Chookaszian, Dr. Myint and Dr. Konowitz.

Count VII, Title VII claims against SCH, Loeber and certain Medical Executive Committee (MEC) members.

Defendants SCH and Dr. Loeber moved on January 8, 1993, for summary judgment on Counts I–IV, and a long period of discovery intervened thereafter, until the last brief was filed on December 10, 1996. The SCH defendants thereafter, on January 30, 1997,

filed a supplemental motion for summary judgment addressed to Counts V and VII, based on the same arguments, and plaintiff filed her own motion for partial summary judgment on May 21, 1997.

The briefing and the accompanying exhibits in this case are massive. The memoranda alone exceed well over 200 pages. The chronology of the motions is itself somewhat curious. In 1993 defendants filed a 46–page 12(m) statement. On February 10, 1995, plaintiff filed an 89–page 12(n) response but did not propose any uncontested facts herself. Some of the responses were cited to specific portions of the record. Most, however, depended on an all-inclusive affidavit by plaintiff at the end of the 12(n) statement. Then, on July 26, 1996, defendant filed a 40–page supplemental 12(m) statement that was a virtual rerun of the earlier statement, but it added an affidavit from Dr. Ronald Wender to reflect the fact that quality-of-care issues had been addressed after the earlier submission. Plaintiff responded again at the time of her "Response to Reply" of the defendants, the fourth brief filed. This time, however, on December 10, 1996, she again filed a 12(m) response and added 566 paragraphs of additional facts, extending over some 106 pages. Many of those paragraphs of additional facts rely upon plaintiff's verification, although some are obviously hearsay and others are subjective conclusions. We will, however, make use of them to the extent we can.

■ Since this motion was first filed there have been two significant decisions by the Seventh Circuit. In *E.E.O.C. v. AIC Security Investigations, Ltd.*, 55 F.3d 1276 (7th Cir.1995), the court held that individuals who do not independently meet the Title VII and ADEA definition of "employer" cannot be held liable under those statutes. *Accord, Williams v. Banning*, 72 F.3d 552 (7th Cir. 1995). In *Alexander v. Rush North Shore Medical Center*, 101 F.3d 487 (7th Cir.1996), the court held that, on the facts in that case, a self-employed physician with staff privileges at a hospital may not bring a Title VII action—or an ADEA action because the definition of "employer" is the same under both statutes—against the hospital, because the

physician does not have an employment relationship with the hospital.

■ Plaintiff seeks to distinguish *Alexander*, arguing that its authority is questionable in light of two Supreme Court opinions and that the facts here are different. We note initially that any argument that the decision in *Alexander* is erroneous must be addressed to the Court of Appeals, not this court. Further, we are not persuaded by plaintiff's catalog of distinctions between her situation and that of the physician in *Alexander*, partly because of the facts stated by her in her 12(m) statement of December 10, 1996. Her exhibits include exhibit 18, the series of contractual arrangements between the hospital and the chair of the anesthesiology department, Dr. Loeber. Those agreements expressly provide that the physicians in the department are independent contractors, who independently bill for their services and provide those services according to their professional judgment. Plaintiff's tax status was as an independent provider. Dr. Loeber had the authority to hire anesthesiologists, although the suspension of their staff privileges was subject to the due process procedures of the hospital. She also had the authority to assign the cases—an authority plaintiff claims was discriminatorily exercised. According to plaintiff, SCH signed an exclusive contract with a corporation, effective February 1, 1990, for the provision of anesthesiology services. This was after her suspension but before the ad hoc committee report and the termination of her staff privileges. On the basis of *Alexander* we are compelled to conclude that plaintiff was not in an employment relationship with SCH as a matter of law.

Plaintiff points to *Shrock v. Altru Nurses Registry*, 810 F.2d 658 (7th Cir.1987), and contends that SCH, as an employer, may be liable for conduct that interferes with employment with others. If that concept has vitality it can only relate to her difficulties in obtaining other positions after her staff privileges were terminated, not to her claims of discrimination in the assignment of cases and the like while she was practicing anesthesiology at SCH (and she would have difficulty in attributing discriminatory assignments to the hospital in any event, since the decisionmaker there was Dr. Loeber, an independent contractor who had that authority by virtue of her contractual arrangements). The § 1981 and § 1985 issues, however, require a review of some discrimination claims in any event.

■ The most serious claim in this case is that plaintiff was discriminated against because of her national origin, color, race, sex and age in the termination of her staff privileges, as that ended her position at SCH, where she had practiced exclusively for many years, and led to public reporting to the Illinois Department of Registration and Education. Accordingly, we deal with that first. And we do so by first discussing what this case is *not* about. This case is not about a reduction in force, with plaintiff claiming that she was terminated discriminatorily while other less well-qualified persons were kept on. The SCH defendants claim that plaintiff did not meet minimum standards for SCH, that she was not qualified for the position. An employer need not compare an employee (we use employer–employee terminology as a matter of convenience) to other employees if the employer honestly, even if erroneously, concludes that the employee is not qualified for the position. A failure to review the qualifications of others may provide an argument that the judgment that plaintiff was not qualified was a pretext and not honestly made, but, ultimately, that plaintiff must prove the termination resulted from discrimination against her (and if she can show that the reasoning given was a pretext, a trier of fact can infer that the real reason was discriminatory). *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120 (7th Cir.1994). We realize that we are using the entire *McDonnell–Douglas* standard here, even though the issue relates to the first step only, a showing of qualification, but we think analysis in pretext terms is useful here.

Plaintiff claims that her bad experiences began when Dr. Loeber came in as chairman in April 1995, although, according to her, others had been mistreated even earlier. She claims that her hours were cut because of Dr. Loeber's discriminatory conduct. The quality-of-care issues that resulted in the ter-

mination of staff privileges did not surface in a major way, however, until Dr. Loeber raised questions about thirteen of plaintiff's cases in a letter on March 17, 1987. The issue escalated and, ultimately, the MEC asked the American Society of Anesthesiologists (ASA) to review three issues: a surplus of physician anesthesiologists, quality of care by specific anesthesiologists (which included the plaintiff), and independent practice/organizational structure. An ASA committee, consisting of Dr. Ronald Wender and Dr. Louis Blancato, undertook a visitation and thereafter issued a report which, among other things, specifically criticized plaintiff's abilities and recommended that her staff privileges not be renewed. That led to plaintiff's summary suspension and a determination by the MEC that plaintiff's staff privileges not be renewed. The next step was the formation of an ad hoc hearing committee (hearing committee). That committee conducted nineteen days of hearings and arguments, compiled a record of 3130 pages, and received thirty-eight exhibits from SCH and over 200 from plaintiff. It unanimously recommended that the suspension and non-reappointment be affirmed. Those recommendations were adopted by the MEC on May 9, 1990. Plaintiff sought review by the SCH Board of Directors. The Board appointed an appellate review committee of six Board members. At the conclusion of the review process the committee determined, in a 21-page report, that the recommendations should be adopted by the Board. The Board did so.

The primary decisionmaker in this process was the hearing committee, although the MEC, the appellate review committee and the Board all played significant roles in the ultimate decision. We think, then, it is useful to describe what the hearing committee heard and what it decided.

The summary of events just described is but a speck in the universe of facts submitted by the parties. We will, in due course, return in more detail to the events that led up to the hearing, keeping in mind that we have no wish to be drowned in a sea of irrelevant minutiae. We think, though, that it is helpful to consider the "climate" at the hospital at the time the hearing commenced.

Plaintiff had earlier complained of bias by a nurse, Karen Filipowski, who prepared several of the incident reports that led to inclusion of cases among the thirteen cases questioned in the March 17, 1987 letter. Represented by counsel, plaintiff complained of discriminatory treatment respecting the contemplated review, although it is not clear that she contended in June and July 1988 that it was based on age, race, gender or national origin. Still, it is clear that plaintiff thought, well prior to the ASA review, that Dr. Loeber was treating her unfairly. Then came the ASA review and its report on June 30, 1989, in which the polarization of the medical staff due to the conflict between Dr. Loeber and plaintiff is noted:

> To the Medical Staff this issue of "Dr. Vakharia vs. Dr. Loeber" has taken on a staff-wide interest. According to all parties, the problem has affected and divided the entire Medical Staff. To many staff members, especially the foreign medical graduates, it represents the Administration trying to undermine a physician because she is a foreign medical graduate. Many primary care physicians and surgeons who are foreign medical graduates apparently have been specifically requesting the service of Dr. Vakharia and using her as a rallying point for the preservation of the foreign medical graduate within the Medical Center. While this perception may or may not be a real issue within the institution, it nonetheless exists. The feelings of most staff members were very strong on this issue.

Then came the ASA Report, in which it was recommended that the staff privileges of the three Asian female anesthesiologists not be renewed. Two of them left the hospital. Plaintiff chose to fight the recommendation and she also filed discrimination charges on August 4, 1989. In the meantime, Dr. Loeber had resigned on April 27, 1989, effective July 1, 1989, citing her desire to leave the "political arena." Plaintiff was summarily suspended, she contends effective as of the date of the ASA Report, although the hospital insists that formal suspension came later.

In any event, the suspension triggered a right to a due process hearing. A period of intense skirmishing between counsel for plaintiff and for the hospital (and, later, for the hearing committee) followed, including a state court lawsuit by plaintiff to get the hearing commenced.

By the time the hearing began the "climate" was obviously supercharged. Dr. Vakharia wished to compare her care with other anesthesiologists at the hospital. She was committed to the view that there was absolutely no basis for criticizing the quality of her care and considered any criticism to arise from discriminatory motivations. Even during the review process those feelings were evident. The ASA Report notes:

> Dr. Vakharia is very emotional about this problem and considers it a personal attack on her integrity and ability. During numerous discussions, she viewed the consultants as "saviours" who had come to "clear" her name. There was no doubt that Dr. Loeber wished Dr. Vakharia, Dr. Puthumana and Dr. Change to leave the institution and to replace them with anesthesiologists she felt would provide more sophisticated care.

The hearing committee insisted that the issue was whether or not plaintiff provided substandard care (and it is clear that the standard was somewhat higher than the standard for the larger community, and rather unclear how much higher that might be).

That mind set, the court believes, has had a significant and adverse impact upon both the hearing and this lawsuit. Plaintiff has painted with a very broad brush, at one time naming upwards of forty parties as discriminating against her. It is an approach she has carried over into other disputes. *See*

*Vakharia v. Little Co. Of Mary Hospital*, 917 F.Supp. 1282, 1288 (N.D.Ill.1996). What the hearing committee was interested in, however, was the quality-of-care issue as it related to plaintiff. Even if Dr. Loeber and others had been motivated by discrimination, the suspension would stand if the hearing committee and subsequent reviewers reasonably believed that plaintiff did not provide the quality of care the hospital required. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 242, 109 S.Ct. 1775, 1786, 104 L.Ed.2d 268 (1989).[1]

We have read the entire transcript of the hearing, which, as we said, extends to nineteen days and 3130 pages. One is struck by the paucity of plaintiff's response to the quality-of-care issue. While she complains that she was not permitted to have an attorney handle the questioning, she was allowed to have an attorney and one of her experts, Dr. Heller, cross-examine Dr. Wender. Moreover, the affidavit and deposition of Dr. Heller (we have read both in their entirety), submitted as part of this motion, reflect that plaintiff was fully capable of articulating what she perceived to be the weaknesses in Dr. Loeber's and Dr. Wender's critiques. Most of the cross-examination, however, was devoted, at length, to other matters.

When plaintiff cross-examined Dr. Loeber and Dr. Wender she was, on several occasions, asked by the committee to get to the cases. She did not. Dr. Wender returned for another session, to be devoted to discussion of the cases. He was not asked about them. Dr. Heller and another expert for plaintiff, Dr. O'Brien, did discuss some of the cases, but they were largely confined to some of the cases cited by Dr. Loeber. They were supportive of the plaintiff in most respects,

---

1. Under *Price Waterhouse*, even if the employer in a Title VII does take race into account, the plaintiff will still not prevail if the employer can "prove that, even if it had not taken [an impermissible characteristic] into account, it would have come to the same decision regarding a particular person." *Id.* at 242, 109 S.Ct. at 1786. Plaintiff's case here is similarly a "mixed-motives" case. We recognize that *Price Waterhouse* has been abrogated by the Civil Rights Act of 1991(CRA), 42 U.S.C. § 2000e–2(m). However, the Supreme Court in *Landgraf v. USI Film Prod.*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) held that certain provisions of the CRA do not apply retroactively. Although the Supreme Court did not specifically address § 2000e–2(m), the Third and Ninth Circuits have held that the CRA does not apply retroactively as it relates to *Price Waterhouse*. *See Chenault v. U.S. Postal Serv.*, 37 F.3d 535, 538 (9th Cir.1994); *Hook v. Ernst & Young*, 28 F.3d 366, 370–73 (3d Cir.1994); *see also Cooke v. Illinois Central Railroad Co.*, No. 94 C 4415, 1996 WL 84230 n. 4 (N.D.Ill. Feb.26 1996). Because plaintiff's claims here accrued before the CRA was enacted her case is controlled by *Price Waterhouse*.

but they were critical about some aspects of her practices. Dr. Wender's testimony was essentially unchallenged. Dr. Heller was asked by the committee to return for cross-examination relating to the quality-of-care issue. He did not return, even though he lives in the Chicago area, unlike Dr. Wender, who came from Los Angeles. Plaintiff testified, although not at length. It was a confrontational and emotional session. It did little to further the committee's understanding of the quality-of-care issue.

The failure to explore the cases continued after this suit was filed. We so noted in our memorandum and order of March 8, 1994, in which we refused to require Dr. Wender to submit to further depositions. Finally, in response to the motion for summary judgment plaintiff filed an extensive affidavit of Dr. Heller. That led to a lengthy deposition. Dr. Heller dealt with many, although not all, of the cases cited by Dr. Loeber, and he focused on his disagreements, rather than his agreements, with Dr. Loeber.

Dr. Heller's affidavit and deposition provide support for the conclusion that, on some cases, Dr. Loeber was just plain wrong; she misread the charges, or thought certain action should have or should not have been taken, and Dr. Heller disagreed. As to others, he did not credit CRNA incident reports. He several times made the point that the written medical records do not tell the whole story and, after discussing the cases with Dr. Vakharia, he believed that she had acted appropriately in situations that could only be fairly evaluated by those who were in the operating room at the time. His analyses did not extend, at least in any substantial respect, to the cases reviewed by Dr. Wender and Dr. Blancato, and not by Dr. Loeber.

Perhaps if Dr. Heller had so testified at the hearing, the outcome would have been different. Perhaps the committee, on the basis of that testimony, might have insisted on hearing further from Dr. Loeber and Dr. Wender. But at the time of the hearing it had before it the testimony of Dr. Loeber, which was very incompletely challenged. This is not a case in which an employer relies, without investigation, upon the account of some supervisor, who, it later turns out, was providing a false story. Dr. Loeber testified. Plaintiff could and did cross-examine. The likelihood that a witness would deliberately misread medical charts is remote since any errors could be exposed on cross-examination. More importantly, the testimony of Dr. Wender, an independent outside consultant with excellent credentials, was largely unchallenged. He was prepared to discuss the cases, which he had reviewed prior to his testimony, and his conclusions remained unchanged. In those circumstances it is not at all surprising that the committee reached the conclusion it did.

The committee "strongly and unanimously" recommended that the suspension be affirmed. It rested primarily upon the ASA Report and Dr. Wender's testimony, noting that Dr. Loeber's testimony "essentially confirmed the ASA's findings ...." The committee concluded, on the basis of the hearing, that Dr. Vakharia "was incapable of accepting constructive criticism and either incapable or unwilling to address those criticisms .... [D]uring the proceedings, she frequently evaded directly answering questions from Committee members about the Committee's areas of concerns ... Dr. Vakharia's responses to the Hospital's questions were argumentative, evasive and incredible .... Unfortunately, Dr. Vakharia and her various representatives seemed more intent on arguing 'procedural' questions than addressing relevant substantive quality of care issues." The committee recognized the qualifications of plaintiff's experts but was critical of their failure to address specific cases. All of those observations have ample support in the hearing record.

The Medical Executive Committee accepted the report on May 9, 1990. Plaintiff asked for appellate review and the Board of Directors appointed an appellate review committee, which submitted a 21–page report on September 7, 1990, affirming the suspension. While its tone is somewhat harsh at times, its conclusions have ample support in the hearing record.

This court does not, of course, sit as a super personnel review authority. We cannot judge whether or not plaintiff provided substandard care, nor are we asked to do so.

It is indeed possible that the hearing committee got it wrong. There is, however, nothing to suggest that the hearing committee was motivated by racial (and, if we consider Title VII and the ADEA, gender or age) discrimination and that it acted on other than the record created during those extensive hearings. The review process relied upon that record and, as we have said, the subsequent conclusions are amply supported by that record. Again, there is no evidence suggesting discrimination. Defendants are entitled to summary judgment on the issue of whether plaintiff's suspension was the result of discrimination.

That leaves open a number of issues relating to the events leading up to the suspension and hearing. We note, first, that the statute of limitations for a § 1981 or § 1985 claim is two years. This action was filed on November 8, 1990. We therefore must keep in mind what plaintiff challenges that occurred before November 8, 1988, and what happened later. Earlier claims of discrimination, if supported by the evidence, can lend support to discrimination claims within the statutory period even though they cannot stand as independent claims.[2]

Plaintiff claims that Dr. McCormick brought in Dr. Loeber to be his instrument to eliminate the Asian female anesthesiologists over the age of 40 as part of a plan going back to 1984. She does not explain why the hospital—where approximately half the medical staff was educated abroad—would single out the relatively small number of anesthesiologists for discriminatory treatment. While she treats race or national origin, gender and age as separate bases of discrimination, her main thrust is a combination of race or national origin and gender, as well she might, since of the other three anesthesiologists, apart from Dr. Loeber and the three Asian women, one was a woman and one was a Burmese male. We note, as well, that in July 1997 five of the eight anesthesiologists were foreign-born or -educated, and

five were women. Plaintiff is correct in contending that the record fully supports the conclusion that Dr. Loeber, early in her role as head of anesthesiology, targeted the three Asian females over 40 as persons she did not want to continue on the staff. But does the record provide sufficient evidence that she was motivated by discrimination? We think not.

Dr. Loeber was introduced to staff in November or December 1985, and began work in April 1985. According to plaintiff, Dr. Loeber's credentials were unimpressive, she was paid far more than others similarly situated, and she did not do much other than aggrandize her own position at the expense of others.[3] Despite plaintiff's perceptions, however, we believe that it is beyond reasonable dispute that Dr. Loeber came to the hospital because of a concern over the quality of the anesthesiology services and that she was charged with the upgrading of those services. (We do not pass judgment on whether she was the right person for that endeavor, as that is irrelevant for the purposes of this motion.) Those services had been part of the department of surgery, with quality assurance review through that department. Anesthesiology became a separate department in 1986, with Dr. Loeber as the chair. Early in 1986 Dr. Chookaszian joined the department. Dr. Loeber described her as "all-American, blonde, with blue eyes and has a funny last name."

By the middle of 1986 the amount of work for the physicians in the department had decreased. Dr. Loeber suggested that the physicians go on part-time status so as to permit them to get lower insurance rates (which the physicians paid). Plaintiff sought the lower rate, but it was denied because she was still at the hospital five days a week. On March 27, 1987, Dr. Loeber wrote plaintiff about the thirteen cases. Dr. Loeber has testified that she asked plaintiff for a response several times thereafter but received no response, which plaintiff denies. About

---

**2.** Plaintiff raises some "continuing violation" contentions. While we do not believe they have merit, we do not specifically deal with them because limitations issues do not affect the ultimate result.

**3.** Plaintiff is alone in her perception that Dr. Loeber did virtually nothing about improving quality of care, as the ASA Report pointed out. That report also pointed out some weaknesses in her administration of the department.

that time Dr. Konowitz, a white native male, joined the staff. Eventually, though, in August 1987, Dr. Loeber wrote to plaintiff asking for a response, and plaintiff did so respond the following month. About this time—some evidence indicates—Dr. Loeber began to weight the assignment system against the three Asian women. In September 1987 plaintiff asked that her work be consolidated into two or three days a week so as to make her eligible for reduced insurance rates. At that time she described the request as due to family responsibility and thanked Dr. Loeber when the request was accommodated, effective October 1, 1987. The hospital contends that the request was due to the quality-of-care issues that were then surfacing. Plaintiff now describes it as a reaction to emerging discrimination. Whatever the reason in plaintiff's mind, it is clear that the schedule reduction was at her request and not compelled by the hospital. Also during that time-frame, in August 1987, plaintiff concedes that Dr. Loeber established quality control procedures not previously in place, although plaintiff characterizes them as largely the work of others. While she was working part-time plaintiff claims that her cases were substantially reduced in number and in value. She continued on rotation, however, with the result that she continued to work on a variety of complex cases.

In January 1988, Dr. Loeber instituted a new assignment system. The anesthesiologists were divided into three classifications: Dr. Loeber, senior anesthesiologists, and junior anesthesiologists. Plaintiff and the other two Asian females were the juniors, and the other three, who included Dr. Myint (a male Burmese) were the seniors, even though one of the qualifications for senior status was board-certification and plaintiff was board-certified, and one of those designated as senior was not. Dr. Loeber dropped the board-certification as a requirement for senior classification in April 1988. The seniors were supposed to handle the more complex cases and the juniors the more routine, although the dynamics of rotation and emergencies caused the juniors to continue to serve in many complex cases.

On March 31, 1988, Dr. Loeber wrote various of the surgeons asking for their preferences among the anesthesiologists. Plaintiff claims that only 35 of 71 surgeons were surveyed and only some responded. Of those that did, plaintiff was least, or close to least, preferred. About that time Dr. Loeber advised the staff that she and the seniors had priority in assignment of all cases and she began to leave plaintiff messages about assistance in finding work elsewhere.

In June 1988 plaintiff notified Dr. Loeber that plaintiff was resuming a full-time schedule. According to plaintiff the part-time status was temporary and for personal reasons, a matter within plaintiff's control. It was and is plaintiff's position that a denial of full-time status is a reduction in privileges which only the Credentials Committee could compel. It was and is the hospital's position that the issue is one of assignment, and Dr. Loeber had the authority to make assignments based upon her perception of relative competency. When Dr. Loeber refused to return plaintiff to full-time rotation, she complained to both Dr. Trakas and the MEC. The MEC, as we said, upheld Dr. Loeber on the assignment issue and began looking around for help in resolving the quality-of-care issue. In the meantime, plaintiff actively solicited support from various surgeons on staff and complained of discrimination sufficiently to prompt the hospital's attorneys to predict that plaintiff would bring a discrimination charge. Dr. Loeber, during this period, broadened her review of plaintiff's cases (the 66 or 67 cases), and Dr. McCormick suggested to plaintiff that she retire in order to avoid airing "dirty laundry."[4] Thereafter, plaintiff also actively solicited work from, as we understand it, primarily foreign-born and trained surgeons, suggesting that she was the victim of discrimination. Although she had been taken off call in July 1988, that solicitation led, for a time, to plaintiff having more work than she could handle. Plaintiff's response also led to her initiating a review of the operating records of the other anesthesiologists, which prompted complaints about her unauthorized review of those records and restrictions upon her access to Dr. Loeber's

---

4. Plaintiff labels that remark as discriminatory. We disagree.

office, where, apparently, at least some anesthesiology supplies were maintained. The ASA review and the hearing followed.

As we have said, the record provides solid support that Dr. Loeber wanted the three Asian women to leave. It does not support a discriminatory motivation. She was brought in to upgrade anesthesiology services. It was some time before she made any assessments, after she had had considerable time to observe the work of the staff. She concluded that the three Asian women were not up to the standard that she thought the hospital believed appropriate. Her view of plaintiff was ostensibly based in part upon her consideration of thirteen occurrence reports. Those were not in the normal course of quality assurance review, which would have provided for contemporaneous assessment, but that review of past reports was wholly consistent with the assignment she had been given. Perhaps Dr. Loeber verbally asked plaintiff to respond and perhaps she did not. What we do know is that plaintiff ignored the matter until directed in writing some five months later to respond, and when she did, the response was handwritten and mostly blamed nurse Filipowski for filing false reports and asked that the nurse be investigated. Dr. Loeber had reason to consider the response hostile and, at least partially, vague and non-responsive.

Dr. Loeber's initial perception of all three anesthesiologists was vindicated by the ASA Report. Two of the three did not contest the ASA's recommendation and did not remain at the hospital. As we have said, we do not here pass judgment on Dr. Loeber's conclusions respecting those thirteen cases, or the 66 or 67 others, but we do not believe a reasonable trier of fact could find that her perceptions of plaintiff's competency were not honestly held. Her review of the records was substantiated by the physicians' survey (imperfect though it may have been), plaintiff's reaction to criticism, the ASA records review and its report on the assessment of others within the hospital that she " 'dumped' extremely ill patients in the recovery room and then became unavailable" (although that

had improved), and that "many surgeons, nurses, and CRNAs described her care under the pressure of difficult situations as being erratic and oftentimes extremely poor." Even Dr. Heller conceded that the medical charting on occasion was far from ideal. Dr. Loeber's one remark about Dr. Chookaszian may not have been politically correct, but it cannot reasonably be viewed as evidence of discriminatory motivation,[5] and her hirings (three, with one there only a few months) were so restricted that they cannot, without more, lend support to plaintiff's claim.

Summary judgment is entered as follows:

1. For SCH and against plaintiff on Count I because SCH is not plaintiff's employer and, if it was, SCH is entitled to summary judgment on the merits.

2. For SCH and Dr. Loeber and against plaintiff on Count II.

3. For SCH and against plaintiff on Count III, for the reasons stated with respect to Count I.

4. For the named defendants and against plaintiff on Count V.

5. For SCH and the MEC defendants and against plaintiff on Count VII for the reasons stated with respect to Count I and for Dr. Loeber and against plaintiff on the merits. Dr. Loeber's possible status as an employer has not been addressed by the parties.

That leaves, then, Count IV, a state law claim, and Count VI, a Sherman Act claim. We address them, beginning with Count VI.

■ On March 30, 1993, this court ruled that a Sherman Act conspiracy claim against certain defendants survived a motion to dismiss because the suspension of privileges arguably had a wider impact than just at SCH. This led to a motion for reconsideration in October of that year, and another such motion in January 1995. Rulings were deferred. Today we consider those motions to dismiss as motions for summary judgment and we grant them.

---

5. Plaintiff relies on two other remarks supposedly by Dr. Loeber. One is hearsay. The other is referenced to a statement by a nurse (Pl.Exh.G). It is not there.

Ordinarily a court should not consider a motion to dismiss as a motion for summary judgment without giving the plaintiff an opportunity to respond. But this is not an ordinary case. Plaintiff, in opposition to the various motions for partial summary judgment and in support of her motion, has called attention to every conceivable matter that she believes may lend support to her contention that her suspension was due to reasons other than quality-of-care issues, and we have reviewed all of her contentions. We see no reason to wait for an inevitable motion with an inevitable result.

The antitrust claim always was marginal. Perhaps defendants are correct in their legal analysis. In any event, we begin by wondering why the ASA, Dr. Vacanti (whose role was limited to selecting the survey team and, apparently, reviewing the draft ASA Report) and the survey team of Dr. Blancato and Dr. Wender would have any interest in eliminating competition by plaintiff. Dr. Loeber, Dr. Chookaszian, Dr. Myint and Dr. Konowitz had an interest in the anesthesiology business at SCH, but only Dr. Loeber was involved in the suspension of plaintiff's privileges. She could not conspire with herself; there is a total absence of any evidence of any conspiracy between her and ASA or the ASA defendants, or between those defendants and the other anesthesiologists at the hospital. Indeed, Dr. Loeber tendered her resignation long before the ASA Report and it became effective about the time the ASA Report was issued and plaintiff was suspended. The motions to dismiss Count VI, considered as motions for summary judgment, are granted.

■ Count IV raises other considerations. It is a state law claim. Ordinarily, if a court rules against a plaintiff on all federal claims short of trial, the pendent state law claims are dismissed without prejudice. Plaintiff may then pursue those claims in state court. But 28 U.S.C. § 1367 does not compel dismissal. *Rothman v. Emory University*, No. 93 C 1240, 1996 WL 377049 (N.D.Ill. July 1, 1996), *aff'd* 123 F.3d 446 (7th Cir.1997). This court has immersed itself in this case for longer than it cares to remember. We see no purpose to be served by inflicting upon the parties and a state court the resolution of the state claims, which require some familiarity with a massive record, if we can resolve it here. And we can.

■ Count IV complains that the hospital violated the Medical Staff Bylaws in a number of respects. She alleges twelve violations in paragraph 59:

(a) applying the Bylaws so as to discriminate against Dr. Vakharia on the basis of her race, color, national origin, and sex;

(b) creating two levels of staff anesthesiologists and assigning Dr. Vakharia and the two other female Asian anesthesiologists to the lowest level of staff within the department;

(c) treating Dr. Vakharia disparately with regard to case assignments and positions within the anesthesiology department when she held full staff privileges as a member of the department and was the only member of the department besides Dr. Loeber who was both Board Certified and a member of the Attending Staff;

(d) allowing Dr. Loeber to exercise authority concerning the administration of the department and staff privileges which the Bylaws reserves to the Credentials Committee and to the Medical Staff Executive Committee;

(e) restricting Dr. Vakharia's rights and privileges as a member of the staff of the anesthesiology department in a manner inconsistent with the Bylaws, and denying Dr. Vakharia notice and a hearing on those restrictions;

(f) singling out Dr. Vakharia disparately and discriminatorily for peer review;

(g) allowing Dr. Loeber to serve on the Ad Hoc Committee that reviewed Dr. Vakharia's complaints about Dr. Loeber's treatment of her;

(h) suspending Dr. Vakharia disparately, discriminatorily, and for improper purposes;

(i) failing to conduct a hearing on Dr. Vakharia's suspension in a timely manner;

(j) allowing physicians who were complainants against Dr. Vakharia or whose own cases were reviewed by the Hearing Committee to serve on that Committee;

(k) failing to conduct the peer review process in accordance with the Bylaws and the Illinois Medical Practice Act; and

(*l*) conducting its peer review process so as to discriminate against Dr. Vakharia on the basis of her race, color, national origin, and sex and to deny her the protections required by the Bylaws.

We turn, first, to the alleged violations relating to the summary suspension. Plaintiff's concerns, as described in her various submissions, range well beyond those alleged. She contends that the matter should have gone to the Credentials Committee, that the membership on the ad hoc hearing committee was rigged because Dr. McCormick became involved and because all the members were men and only one (Dr. Ovieda) was foreign-born, that various of the members were biased against her because of prior involvements with her, that the selection of the hearing officer was rigged, that the notice provided was insufficient, that the committee forced out her attorney and allowed attorneys for the hospital to participate in the proceedings, that her cross-examinations were curtailed, that she was prejudiced because the ASA would not permit her intended experts to testify for her, that the committee refused to hear evidence about discrimination and the quality of care of other anesthesiologists, that there was a long delay before the hearing commenced, that the ASA Report upon which the committee relied was obviously shallow and insubstantial because of time restraints, and that neither the ASA review nor the hearing was a peer review.

Running through all her contentions is the ultimate conclusion that the hearing was a sham proceeding intended to remove her from the hospital because she was an Asian woman. We have already determined that the record does not support such a conclusion. But are there specific matters that could justify relief under Illinois law? That requires a consideration of Illinois law.

Illinois law, both cases and statutes, reflects a significant hesitation about intruding into the peer review process. Judicial review of a suspension is limited to determining whether there has been a substantial violation of the bylaws or whether the record establishes actual unfairness in the proceeding. *Adkins v. Sarah Bush Lincoln Health Center,* 129 Ill.2d 497, 136 Ill.Dec. 47, 544 N.E.2d 733 (1989). As the facts in *Adkins* make clear, peer review under Illinois law includes the review of a single physician. *See also Harris v. Bellin Memorial Hosp.,* 13 F.3d 1082 (7th Cir.1994). In a hospital setting it is inevitable that the members of the committee will have had prior involvement with the physician being reviewed and may even have general personal views about that physician's level of competence, but they can make the decision unless the record discloses actual bias. *Id.; Chessick v. Sherman Hospital Association,* 190 Ill.App.3d 889, 138 Ill. Dec. 98, 546 N.E.2d 1153 (1989); *Lapidot v. Memorial Medical Center,* 144 Ill.App.3d 141, 98 Ill.Dec. 716, 494 N.E.2d 838 (1986); *Ladenheim v. Union County Hospital District,* 76 Ill.App.3d 90, 31 Ill.Dec. 568, 394 N.E.2d 770 (1979). Even if the suspension is in substantial violation of the bylaws or is demonstrably unfair, the only remedy is to order compliance, not reinstatement. *Carson v. Northwest Community Hospital,* 192 Ill.App.3d 118, 139 Ill.Dec. 194, 548 N.E.2d 579 (1989); *Gates v. Holy Cross Hospital,* 175 Ill.App.3d 439, 124 Ill.Dec. 897, 529 N.E.2d 1014 (1988). There is no damages remedy against either the hospital or the individuals who participated in the decision, even though that restriction on remedies may work an occasional injustice. *Knapp v. Palos Community Hospital,* 176 Ill.App.3d 1012, 126 Ill.Dec. 362, 531 N.E.2d 989 (1989).

The medical staff bylaws provide that, upon suspension of privileges by the chief executive officer (Dr. McCormick), the Medical Executive Committee shall recommend within one week whether or not the suspension shall continue. If the MEC recommends continuation (and it is continued), the MEC shall specify to the physician that she has ten days to request a hearing or an appellate review. If she requests a hearing it is supposed to commence within ten days of the request. The hearing is to be conducted by an ad hoc committee of not less than five members of the medical staff appointed by the president of the medical staff (Dr.

Trakas), in consultation with the MEC. No member can have "actively participated in the consideration of the adverse recommendation." Postponement of the hearings shall be made only with the approval of the ad hoc hearing committee and shall only be for good cause shown and in the sole discretion of the hearing committee. Neither the physician nor the hospital has a right to be represented unless the committee permits both sides to be represented. The rules of evidence do not apply. The physician may be accompanied by a colleague or another physician and has to present her side by cross-examination and her own evidence.

Plaintiff contends she was suspended on June 30, 1989, when Dr. McCormick told her not to provide services. The hospital contends that her privileges were not formally suspended until much later and, within ten days, the MEC on August 1, 1989, recommended continuation. Perhaps there was a technical violation (although probably not, as we will later explain). No Illinois court has, however, suggested that a hearing be repeated several years later because the process initially got off to a slow start and we do not subscribe to such a nonsensical result.

Plaintiff did request a hearing and an ad hoc committee was appointed by Dr. Trakas. Plaintiff complains that Dr. McCormick and others tried to influence the selection, and it is apparent that he wanted a solid committee—plaintiff had already filed her E.E.O.C. charges—but it was Dr. Trakas who named the members with, apparently, some distress over Dr. McCormick's attempt to be involved. None of the members had actively participated in "the adverse recommendation," *i.e.*, the Medical Executive Committee recommendation. Some of the members had been the surgeon on one or two cases included in the Dr. Loeber case lists (or the cases included in the ASA review), one had participated in the decision the previous year to leave assignments to Dr. Loeber as the department chairman and to request an outside review, and one had a previously-developed (but not expressed) concern about plaintiff's competence in the more difficult, complicated cases. On the other hand, another member had spoken up for her the previous year

when she sought to return to full-time practice. While the panel was all male and only one was foreign-born, we reject the notion that women and more foreign-born physicians had to be on the committee to provide a fair hearing. The members were not selected in violation of the bylaws, none of their past involvement disabled them from serving, and the record of the hearing is absolutely devoid of any showing of actual unfairness or bias.

The hearing was slow in starting. First scheduled to begin September 18, it did not get under way until November 3. One reason was the inability of one member to serve, necessitating selection of another. The committee itself had some difficulty coordinating scheduling. But the hearings did commence—and went on until April. A technical violation? Possibly.

Plaintiff did not get a hearing officer who had been suggested by her. The hearing officer selected was appropriately qualified, had no close ties to the hospital and, the record reflects, acted fairly and impartially. Neither plaintiff nor the hospital (actually, the executive committee) were represented by counsel, although both were entitled to have counsel present to provide advice. Plaintiff's counsel had an exchange with one of the committee members at one point and did not return. Plaintiff's counsel could be (and was) contentious, as we noted in our memorandum and order of March 8, 1994, the member apologized, and the committee invited plaintiff to have that attorney return. She did not have him return. The hospital attorneys did stay. Their participation was very limited.

Before the hearing began plaintiff, on September 1, 1989, was provided a notice of hearing that specifically described the deficiencies noted in the ASA Report, provided a copy of the ASA Report except for the portions dealing with the other two anesthesiologists, listed 67 cases reviewed by Dr. Wender and Dr. Blancato, and noted that plaintiff had copies of those medical records.

Plaintiff had asked Dr. Ivankovich to be her expert. But he was an officer of ASA, and ASA, not the hospital, asked (not demanded) that he not undertake that responsi-

bility because of a perceived conflict of interest since a centerpiece of the hearing would be the ASA Report. He agreed. Likewise, three other ASA officers or peer review committee members turned plaintiff down. We see no transgressions there. Indeed, as we have remarked before, given plaintiff's proclivity for ascribing base motives to those who do not entirely share her views, an ASA officer who did not fully support plaintiff's perceptions of her own quality of care would have done so at his peril. Available to plaintiff as experts was the whole universe of anesthesiologists other than that small group. Plaintiff enlisted the services of Dr. Heller months before he was to testify.

Dr. Wender was at SCH only two days and Dr. Blancato only a day and-a-half. They had, however, considerable material to review before they arrived and they had additional material supplied to them after they left. Plaintiff talked to Dr. Wender for one and-a-half to two hours and she later supplied him with numerous records pertaining to the other anesthesiologists. She is correct that the ASA review was not a full review of all the anesthesiologists in the sense that the reviewers considered substantially the same number of records for each anesthesiologist. The hospital, after all, had asked for recommendations about certain anesthesiologists, including plaintiff. Still, they did some comparative reviewing, although whether or not they had access to all the questionable cases of the others is in dispute. Plaintiff certainly tried to make those records available to them.

More importantly, however, is that the hearing was about plaintiff's quality of care. The committee was entitled to focus on that, and it did so. And in doing so we see no substantial violations of the bylaws and no unfairness. We grant summary judgment for the hospital and against plaintiff, on the state law medical staff bylaw claims relating to the suspension.

 That leaves state law claims relating to events preceding the suspension. Plaintiff complains that she was twice passed over for appointment as chair, that she was "forced" to restrict her work to part-time, that she was taken off rotation in July 1988, that she was denied return to full-time status, and that she was classified as a junior when Dr.

Loeber created the "senior-junior" status. Although she claims that she continued to handle many complicated cases, at least up to going off rotation in 1988, she claims that her income was adversely affected by a reduction in cases and change in her mix of cases.

Plaintiff bases these claims on alleged violations of the medical staff bylaws, viewed as a contract between her and the hospital. *Fahey v. Holy Family Hospital,* 32 Ill. App.3d 537, 336 N.E.2d 309 (1975), *cert. denied,* 426 U.S. 936, 96 S.Ct. 2650, 49 L.Ed.2d 387 (1976). She cannot base her claims upon some specific contract between her and the hospital, as there was none. Indeed, the contract between Dr. Loeber and the hospital granted her the authority to make case assignments, and it is case assignments that are the core of these claims by plaintiff. But can these claims be viewed as possible medical staff bylaws violations? Failures to appoint plaintiff as chair possibly can be viewed as such, although she did not ask for a hearing on those claims, and they have long since been waived. That is also true of her other claims, with the possible exception of her removal from rotation and failure to return her to full-time status in 1988—and maybe the "senior-junior" classification.

SCH insists that plaintiff was not returned to full-time status in 1988 because there was not enough work for the anesthesiologists if plaintiff was given more cases—or so Dr. Loeber believed. Quite possibly this is so, but plaintiff disputes that, and we cannot, on the present record, conclude that the hospital is indisputably correct. By then the quality-of-care issue had long since surfaced and the "senior-junior" classification was in place. The ASA Report clearly concludes that the "senior-junior" classification implicates the medical staff bylaws.

Still, we are mindful that there is a significant difference between privileges and employment. *Bryant v. Glen Oaks Medical Center,* 272 Ill.App.3d 640, 208 Ill.Dec. 928, 650 N.E.2d 622 (1995). Privileges relate to qualifications, while employment is a matter of contract, *Faucher v. Rodziewicz,* 891 F.2d 864 (11th Cir.1990); *Collins v. Associated Pathologists, Ltd.,* 844 F.2d 473 (7th Cir. 1988). That there may have been a practice of equalizing assignments does not create an employment obligation, *Knapp v. Palos Com-*

*munity Hospital,* 125 Ill.App.3d 244, 80 Ill. Dec. 442, 465 N.E.2d 554 (1984), *app. after remand,* 176 Ill.App.3d 1012, 126 Ill.Dec. 362, 531 N.E.2d 989, (1988), *app. denied,* 125 Ill.2d 566, 537 N.E.2d 810, 130 Ill.Dec. 481 (1989), Dr. Paulissian, testifying for plaintiff, recognized that Dr. Loeber could make assignments based on perceptions of relative competency and Dr. Heller agreed that assignment by a department head on that basis was a common and accepted practice.

Even if we assume, however, that the "senior-junior" classification was a violation of bylaws, plaintiff still does not prevail. We have already noted the reluctance of the Illinois courts to intervene in disputes relating to hospital staffing judgments and that even when the issue is reduction of privileges the sole remedy is another hearing. Judicial review of assignment practices is even more intrusive, and plaintiff points to no Illinois case that provides support for the view that restrictions upon a physician's practice, short of the suspension of privileges, triggers judicial review. The only possible exception is *Fahey, supra,* but there the hospital conceded that a rule implicated the bylaws and the court held that the rule was permissible even absent a hearing.

If we were to direct that a hearing be held that related to case assignments prior to the suspension, we would, in effect, be requiring the hospital to reconsider its assignment practices several years ago, without any possible economic benefit to plaintiff. We are not aware of any Illinois law so requiring, and, as a federal court sitting in diversity, we should not be creating remedies not sanctioned, with reasonable clarity, by that controlling law. Indeed, the most analogous Illinois Supreme Court case. *Adkins, supra,* strongly suggest by implication that the upholding of a suspension wipes away any claims peripheral to the suspension claim. We grant summary judgment for the hospital and against plaintiff on Count IV.

The case began with a suspicion arising from the separation of all three of the Asian women anesthesiologists from the hospital. Despite massive discovery the discrimination claim has never advanced beyond suspicion, and it was that claim that has been the core

of this lawsuit. If a plaintiff can prove the articulated cause of privileges suspension, concerns about quality of care, is a pretext, the trier of fact has some latitude in inferring that the real motive was discriminatory, *Anderson v. Baxter Healthcare Corp., supra.* But here plaintiff has not come up with evidence that would permit a reasonable trier of fact to conclude that the articulated cause was a pretext. We cannot know with certainty what various people may have thought. It is not enough, however, to raise the possibility that the suspension of privileges may have been the result of base motives when the evidence corroborates the reasons given. Plaintiff has the burden of proving her case by a preponderance of the evidence, and that means something beyond "maybe" and "perhaps." We grant summary judgment for the defendants and against plaintiff on the remaining counts of the complaint. We deny plaintiff's motion for partial summary judgment.