**Dr. Mark F. ALEXANDER,
Plaintiff–Appellant,**

v.

**RUSH NORTH SHORE MEDICAL
CENTER, Defendant–Appellee.**

No. 95–2782.

United States Court of Appeals,
Seventh Circuit.

Argued May 31, 1996.

Decided Nov. 25, 1996.

As Amended on Denial of Rehearing and
Suggestion for Rehearing En Banc
Feb. 7, 1997.

Ayesha S. Hakeem, Chicago, IL, David L. Lee (argued), Tomes, Lee & Dvorak, Chicago, IL, for Plaintiff–Appellant.

Sidney I. Schenkier (argued), Jenner & Block, Chicago, IL, for Defendant–Appellee.

Before BAUER, FLAUM, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

This appeal invites us to reconsider our divided decision in *Doe v. St. Joseph's Hosp. of Fort Wayne*, 788 F.2d 411 (7th Cir.1986), concerning whether a self-employed physician with staff privileges at a hospital may bring a Title VII action alleging that the hospital's revocation of his privileges constituted unlawful discrimination. Finding *Doe's* holding—that a physician may bring such an action even absent proof of an employment relationship with either the hospital or his patients—to be irreconcilable with our later decisions in *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377 (7th Cir.1991), and *Ost v. West Suburban Travelers Limousine, Inc.*, 88 F.3d 435 (7th Cir.1996), we overrule *Doe* and affirm the district court's judgment in favor of the hospital.\*\*

## I. HISTORY

The plaintiff in this case is an Egyptian-born Muslim and a physician. He became affiliated with and was granted staff privileges as an anesthesiologist at Skokie Valley Hospital in 1974. Two years later Mohammed Faoud Abd–Allah changed his name to Mark Alexander in what he testifies was an attempt to gain greater acceptance among the patients and staff at the hospital. In 1987, Skokie Valley Hospital merged with Rush–Presbyterian Hospital, and from then

\*\* This opinion was circulated among all judges of this court in active service pursuant to Circuit Rule 40(f) because it overrules *Doe v. St. Joseph's Hosp. of Fort Wayne,* 788 F.2d 411 (7th Cir. 1986). No judge requested rehearing *en banc.*

on it became known as Rush North Shore Medical Center (Rush North Shore).

After the merger, Dr. Alexander continued to have staff privileges as an anesthesiologist at Rush North Shore. As a condition of his privileges, Dr. Alexander was required to spend a specified amount of time per week "on call" to the hospital's emergency room. Rush North Shore's on-call policy, adopted in November 1985, requires a physician on call to be reachable by pager or by phone, to call the hospital within twenty minutes of being paged, to remain within forty-five minutes potential travel time to the hospital, and to come to the hospital if requested to do so by the emergency room physician on duty.

At 6:00 P.M. on February 20, 1988, a patient who had suffered a head injury rendering her comatose was brought into the Rush North Shore emergency room. The patient suffered from internal cranial bleeding and had vomited earlier, but she was breathing on her own. Shortly after her arrival at the emergency room, the patient vomited again. Dr. Patricia Bitter, the emergency room physician on duty, attempted several intubations (both through the mouth and with a fiberoptic scope through the nose) to prevent potential aspiration, but her attempts were unsuccessful. Dr. Bitter paged two on-call surgeons who could perform a tracheostomy (a surgical procedure for creating an airway through the throat). While awaiting the surgeons' responses, Dr. Bitter phoned Dr. Alexander for help.

Dr. Bitter claims that she asked Dr. Alexander to come in and assist with intubating the emergency room patient, but that he refused to report to the hospital. Dr. Alexander, on the other hand, maintains that Dr. Bitter never actually requested his presence. He contends that after Dr. Bitter called him and explained the situation, he informed her that in light of the bleeding and swelling in the patient's throat caused by her failed intubation attempts, any further efforts to intubate could prove fatal. Dr. Alexander states that he told Dr. Bitter that the patient was in need of a tracheostomy, a procedure that, as an anesthesiologist, he was not qualified to perform. He claims that he told Dr. Bitter he would remain available to come into the hospital if his particular skills were needed, but that she left him waiting on hold and never asked him to come in.

After speaking with Dr. Alexander, Dr. Bitter immediately received a call from Dr. Upendranath Nimmigadda, a surgeon whom she had paged earlier. Dr. Nimmigadda came into the hospital and performed a tracheostomy on the patient. Dr. Bitter told Dr. Nimmigadda that Dr. Alexander had refused to assist her after apprising her that Rush North Shore did not possess a suitable fiberoptic laryngoscope for nasal intubation.

Meanwhile, Dr. Alexander called the emergency room again and was put in touch with Jake Strykowski, a respiratory therapist at the hospital. Dr. Alexander asked if the emergency room patient "really needed" his help. Strykowski claims that he told Dr. Alexander that the patient was becoming increasingly unresponsive and that they had contacted Dr. Alexander because of their inability to intubate, but that Dr. Alexander claimed he did not have experience with Rush North Shore's flexible fiberoptic equipment. Strykowski states that he informed Dr. Alexander that the hospital did have the equipment that he was accustomed to, but that by that time Dr. Nimmigadda had been secured and the situation was under control.

The next day, Dr. Bitter filed a complaint concerning the incident. The hospital investigated her allegations, gathering the statements of Strykowski and Drs. Bitter, Alexander, and Nimmigadda. After consideration and deliberation by several panels of the hospital's hierarchical internal review structure, the board of trustees informed Dr. Alexander by letter that his staff privileges had been revoked for violation of the hospital's on-call policy.

Dr. Alexander filed a charge with the Illinois Department of Human Rights and with the Equal Employment Opportunity Commission, alleging that Rush North Shore had revoked his staff privileges not because he had violated the hospital's on-call policy, but because of his religion and national origin. Both the IDHR and the EEOC investigated and dismissed Dr. Alexander's charge, finding no evidence of discrimination.

Thereafter he filed suit in the Northern District of Illinois, claiming that Rush North Shore's revocation of his privileges constituted unlawful discrimination in violation of the Civil Rights Act of 1964, Title VII, 42 U.S.C. § 2000e *et seq.* After discovery, Rush North Shore moved for summary judgment on two grounds: (1) that Dr. Alexander was precluded from bringing a Title VII action against the hospital because the undisputed facts in the record demonstrated that he was an independent contractor, rather than an employee of the hospital; and (2) that Dr. Alexander could put forth no evidence demonstrating that Rush North Shore's proffered reason for the revocation of his privileges—i.e., its belief that Dr. Alexander engaged in serious misconduct but had failed to acknowledge his wrongdoing or to provide any assurance that the conduct would not recur—was a pretext for unlawful discrimination.

In an effort to demonstrate that Rush North Shore's articulated reason for his privilege revocation was pretextual, Dr. Alexander offered evidence attempting to show (1) that various Rush North Shore personnel had on several occasions in the past made derogatory remarks concerning his religion and ethnicity; (2) that he had engaged in no wrongdoing on the night in question; and (3) that Rush North Shore had imposed much less serious sanctions on four other physicians, Drs. Britt, Taxman, Abrams, and Friedman, who had violated the on-call policy in the past but who were not Egyptian or Muslim.

In ruling on the motion for summary judgment, *Alexander v. Rush North Shore Medical Center,* 851 F.Supp. 330 (N.D.Ill.1994), the district court held first that, under *Doe v. St. Joseph's Hospital,* it was unnecessary for Dr. Alexander to demonstrate an employment relationship with the hospital in order to maintain a Title VII action; the district court found it sufficient for Dr. Alexander to have alleged that the hospital discriminatorily interfered with the business relationships he had with his present or potential patients. Secondly, the district court found there to be no triable issue as to whether the hospital honestly believed that Dr. Alexander's mis-

conduct occurred. Thus, Dr. Alexander was precluded from claiming at trial that the hospital knew he had not violated the on-call policy; he was limited to arguing that their harsh response to his alleged wrongdoing constituted disparate treatment. Finally, the district court found it indisputable based on the facts in the record that two of the four doctors, Drs. Britt and Taxman, were not similarly situated with Dr. Alexander and, therefore, that their relatively lighter sanctions were not evidence of pretext.

After a trial, the district court determined that Dr. Alexander had failed to prove by a preponderance of the evidence that Drs. Friedman and Abrams had engaged in misconduct as serious as his own but had nonetheless been treated more favorably, nor that there was a nexus between any past derogatory remarks concerning Dr. Alexander's religion or ethnicity and the board's decision to revoke his privileges. Thus, the district court found that Dr. Alexander had failed to demonstrate pretext, and it entered final judgment in favor of Rush North Shore. Dr. Alexander appeals both the entry of partial summary judgment and the district court's final judgment after trial.

## II. ANALYSIS

■ In deciding this appeal, we need turn no further than to the district court's ruling on Rush North Shore's motion for summary judgment, citing *Doe v. St. Joseph's Hospital,* that Dr. Alexander could maintain a Title VII action against Rush North Shore even absent a demonstration of an employment relationship between himself and the hospital. We exercise plenary review over a district court's decision concerning summary judgment, drawing our own conclusions of law and fact from the record before us, *Thiele v. Norfolk & Western Ry. Co.,* 68 F.3d 179, 181 (7th Cir.1995), and it is well settled that we may affirm the judgment of the district court on any sufficient basis supported by the record, *Burda v. M. Ecker Co.,* 2 F.3d 769, 773 (7th Cir.1993). Under FED. R. CIV. P. 56(c), summary judgment is appropriate if "there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law."

In *Doe*, St. Joseph's Hospital revoked a physician's staff privileges as a disciplinary measure after the hospital's internal review board ruled against her in proceedings concerning a complaint filed by another physician. After the appropriate administrative filings proved unsuccessful, Doe (the aggrieved physician) filed an action in district court alleging, among other things, that the hospital's revocation of her privileges constituted unlawful racial discrimination in violation of Title VII. The district court, however, dismissed Doe's suit at the pleading stage because she did not contend that she was an employee of the hospital.

On appeal, in a divided decision, we held that the dismissal was unwarranted because it was unnecessary for Doe to allege an employment relationship with the hospital in order to maintain a discrimination suit against it. *Doe*, 788 F.2d at 422–25. Title VII provides, in part, that it is unlawful for an employer:

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a)(1). The *Doe* majority opined that because this section expressly applies to "any individual" rather than to "any employee," interpretively restricting the Act's protection to only former, present, and potential employees would be inconsistent with our charge to construe Title VII "liberally so as to further the goals and purposes of eliminating discrimination in employment." *Id.* at 422 (quoting *Unger v. Consolidated Foods Corp.*, 657 F.2d 909, 915 n. 8 (7th Cir.1981), *vacated on other grounds*, 456 U.S. 1002, 102 S.Ct. 2288, 73 L.Ed.2d 1297 (1982)). Given that the Act outlaws employer discrimination against "any individual" with respect to his "privileges of employment," the *Doe* majority held that Doe needed only to show that the hospital met the statutory definition of an "employer" and that it interfered with her present or future employment opportunities on the basis of her membership in a protected class. 788 F.2d at 422–23 (relying

on *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C.Cir.1973), and *Puntolillo v. New Hampshire Racing Comm'n*, 375 F.Supp. 1089 (D.N.H.1974)).

The partial dissent argued that it was impossible for the hospital to have interfered with Doe's employment opportunities because, under the common law meaning of "employee," Doe was not employed by her patients any more than she was employed by the hospital. *Doe*, 788 F.2d at 427 (Ripple, J., concurring in part and dissenting in part). The partial dissent maintained that Doe was instead an independent contractor and, thus, that she was precluded from bringing her suit against the hospital because she did not fall under Title VII's protection. *Id.* To this, the majority responded that perhaps the common law employee/independent contractor dichotomy was inappropriate as applied to antidiscrimination legislation. *Id.* at 424– 25 & n. 28. The majority concluded that dismissal of Doe's claim was inappropriate even though she could not demonstrate an employer-employee relationship with either her patients or the hospital, so long as she could show that the hospital interfered in some way with her economic possibilities. *Id.* at 425.

*Doe*'s conceptual underpinnings, however, can no longer hold fast after our more recent decisions in *Knight v. United Farm Bureau Mut. Ins. Co.*, and *Ost v. West Suburban Travelers Limousine, Inc.* The *Knight* case concerned an insurance agent who brought a Title VII sex discrimination action against the insurance company with which she was affiliated. 950 F.2d at 377. Similarly, *Ost* involved an airport limousine driver who brought a Title VII sex discrimination claim against her dispatching company after the company terminated its business relationship with her. 88 F.3d at 436. In deciding both *Knight* and *Ost*, we looked—contrary to *Doe*'s assertion that the common law employee/independent contractor framework is inapplicable to a Title VII action—to whether under a test of common law agency principles the plaintiff was an employee of the defendant or an independent contractor. *Knight*, 950 F.2d at 378–81; *Ost*, 88 F.3d at 437–40. We then affirmed the district court

judgments against the plaintiffs in both cases, announcing the rule—contrary to *Doe*'s holding that a doctor can maintain a Title VII action even if he is an employee of neither the hospital nor his own patients—that a plaintiff "must prove the existence of an employment relationship in order to maintain a Title VII action against [the defendant]," and that "[i]ndependent contractors are not protected by Title VII." *Knight*, 950 F.2d at 380; *accord Ost*, 88 F.3d at 440. It was insufficient that United Farm Bureau Mutual Insurance Co. interfered with Knight's present and potential business opportunities with her clients, or that West Suburban Travelers Limousine, Inc., interfered with Ost's economic possibilities with her customers. The simple fact that the plaintiffs were not employees, that they could not demonstrate the existence of an employment relationship, rendered them without the ambit of Title VII protection and precluded them from bringing discrimination actions alleging violations of the Act.

Application of this rule in *Doe*—where the plaintiff conceded that she was not an employee of the hospital and, thus, was an independent contractor—would have effected precisely the opposite result from that reached in *Doe's* majority opinion.

On the other hand, it could be argued that a physician who enjoys hospital staff privileges does, under certain factual situations, share an indirect employer-employee relationship with the hospital sufficient to invoke Title VII protection. *Cf. Shrock v. Altru*

*Nurses Registry*, 810 F.2d 658, 660 (7th Cir. 1987) (implying that *Doe* and *Sibley* may be factually distinguishable from the rule that Title VII does not cover independent contractors in that there may be an "indirect employer-employee relationship" between the hospital and the physician or nurse). Dr. Alexander attempted just this at summary judgment by arguing that on the basis of the undisputed facts, he was an employee of Rush North Shore as a matter of law.

Dr. Alexander's claim, however, is untenable in light of our employee/independent contractor analysis in *Ost*. There, we applied a common law test, which "involves the application of the general principles of agency to the facts," *Knight*, 950 F.2d at 378, in order to determine whether Ost, a limousine driver, was an employee of the dispatching company or an independent contractor. *Ost*, 88 F.3d at 437–38. The test requires us to focus on five factors:

(1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations.

*Ost*, 88 F.3d at 438 (quoting *Knight*, 950 F.2d at 378–79).[1] "Of [the] several factors to be

---

1. The Supreme Court recently authorized applying a similar control-oriented agency test to determine whether an individual is an employee under the Employee Retirement and Income Security Act ("ERISA"), a statutory codification that defines "employee" at 29 U.S.C. § 1002(6) in the same circular manner as does Title VII at 42 U.S.C. § 2000e(f). *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323–24, 112 S.Ct. 1344, 1348, 117 L.Ed.2d 581 (1992). The Supreme Court explained:

In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties;

whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* (quoting *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751–52, 109 S.Ct. 2166, 2178–79, 104 L.Ed.2d 811 (1989)). Just as we held in *Knight*, the Supreme Court identifies the employer's control over the manner of work performance as the test's primary focus. The other factors mentioned are essentially subsumed within (and therefore equivalent to) the *Knight* five-factor test. *See Knight*, 950 F.2d at 379 n. 2 (finding that the five-factor inquiry adequately

considered, the employer's right to control is the most important when determining whether an individual is an employee or an independent contractor." *Knight,* 950 F.2d at 378; *accord Ost,* 88 F.3d at 438. Thus, "[i]f an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist." *Ost,* 88 F.3d at 439 (quoting *Spirides v. Reinhardt,* 613 F.2d 826, 831–32 (D.C.Cir. 1979)).

Looking to these five criteria, paying special attention to potential employer control over the manner in which work is accomplished, one finds that the business relationship between Dr. Alexander and Rush North Shore is strikingly similar to that shared by Ost and West Suburban Travelers Limousine. In *Ost,* West Suburban drivers were skilled in more mundane ways, but they owned their own limousines; they were responsible for paying their own insurance premiums, license fees, and employment taxes; they collected their own fees directly from customers and never received paychecks from West Suburban; they were able to work on those days that they preferred; they could choose the routes by which they would reach desired destinations; and they were allowed to work for other dispatching services if they wished to do so. 88 F.3d at 438. From this, we determined that "[e]ach of these facts indicates that the manner in which the drivers performed their services for West Suburban was primarily within their own control." *Id.*

Similarly, Dr. Alexander did not supply his own equipment or assistants, but he did possess significant specialized skills; he listed his employer on income tax returns as Central Anesthesiologists, Ltd., his personal wholly-owned professional corporation that was responsible for paying his malpractice

insurance premiums, employment benefits, and income and social security taxes; he was responsible for billing his patients and he collected his fees directly from them; he never received any compensation, paid vacation, private office space, or any other paid benefits from Rush North Shore; he had the authority to exercise his own independent discretion concerning the care he delivered to his patients based on his professional judgment as to what was in their best interests; he was not required to admit his patients to Rush North Shore; and he was free to associate himself with other hospitals if he wished to do so. As in *Ost,* it seems clear that the manner in which Dr. Alexander rendered services to his patients was primarily within his sole control.

Dr. Alexander argues that he was, in fact, an employee of Rush North Shore because he was required to spend a specified amount of time per week "on call" and because, by virtue of the nature of being an anesthesiologist, most of his operating room patients were assigned to him on a daily basis by the anesthesiology section head. Yet, Ost submitted similar evidence, noting that West Suburban determined its drivers' starting times, required them to call in when they signed off duty, assigned the drivers' morning passengers, required that the drivers' vehicles be made available during certain times, set the rates the drivers charged, and determined which drivers would receive which customers. *Ost,* 88 F.3d at 438. We held there that "[t]hese constraints do not, however, establish an employer-employee relationship because the details concerning performance of the work remained essentially within the control of the driver." *Id.* at 438–39. The same is true of this case, and we must find that on the basis of the undisputed facts in the record, Dr. Alexander is an independent contractor as a matter of law.[2]

---

addresses the more numerous factors considered by some other courts).

**2.** We come to the conclusion that Dr. Alexander is an independent contractor because he is also not an employee of his patients, just as an insurance agent or a limousine driver is not an employee of her customers. It is important to note that our ruling today is limited to overturning *Doe*'s holding that a physician may bring a Title

VII action against a hospital even though he is an independent contractor and not an employee. We have no occasion to go further and determine if a Title VII plaintiff must always demonstrate that he is an employee *of the defendant employer.* Thus, we continue to leave open the question that went unanswered in *Shrock,* 810 F.2d at 660— *i.e.,* whether an employee of employer *X* may bring a Title VII action against employer *Y* when

We are aware that at trial, the district court—relying on *Doe*—permitted neither Dr. Alexander nor Rush North Shore to introduce evidence of Dr. Alexander's "employment status." This fact, however, does not require us to remand this case to the district court for a determination of whether Dr. Alexander was an employee of the hospital or an independent contractor. At the summary judgment stage, both parties had the opportunity to fully address this issue. Thus, we can appropriately rely upon that record, as well as the uncontested facts in the Pretrial Order,[3] to conclusively determine that Dr. Alexander was an independent contractor.

Given that *Doe's* holding is inconsistent with *Knight* and *Ost,* Dr. Alexander's status as an independent contractor precludes him from bringing a Title VII action against the hospital, and thus the entry of summary judgment against Dr. Alexander would have been appropriate. The ultimate disposition at trial provided a correct result and the judgment of the district court in favor of Rush North Shore is AFFIRMED.

---

*Y* is not his employer, but merely someone whose discriminatory conduct interferes with his employment with employer *X*.

**3.** Moreover, we examined the contested facts from the Pretrial Order (relevant to determining

the employee/independent contractor issue, *see* Pretrial Order, p. C–4 ¶ 35), in the light most favorable to Dr. Alexander. In that regard, we

---

determined that Dr. Alexander was an independent contractor even though he did not supply his own equipment or assistants, he was required to spend a certain amount of time "on call," and he was assigned most of his operating room patients by the hospital's anesthesiology section head on a daily basis.