[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-15061

_____

D.C. Docket No. 0:11-cv-61403-JIC

MOSHE ASHKENAZI,

Plaintiff - Appellant,

versus

SOUTH BROWARD HOSPITAL DISTRICT
d.b.a. Memorial Healthcare System,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 23, 2015)

Before WILIAM PRYOR and JORDAN, Circuit Judges, and WALTER,[*] District
Judge.

_____

[*] Honorable Donald E. Walter, United States District Judge for the Western District of
Louisiana, sitting by designation.

PER CURIAM:

Dr. Moshe Ashkenazi is a surgeon.  After his surgical privileges were revoked, Dr. Ashkenazi sued the South Broward Hospital District, where he provided on-call services, asserting violations of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*, and the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.*  The district court granted summary judgment in favor of the District, in part because it found that Dr. Ashkenazi was an independent contractor.

Dr. Ashkenazi argues on appeal that the district court erred because (1) he showed that there was a genuine issue of material fact as to whether he was an employee of the District, and thus able to bring discrimination and retaliation claims under the ADEA and FCRA; (2) Florida law permits independent contractors to bring retaliation suits under the FCRA; and (3) the protections of the ADEA and FCRA encompass his claims that the District interfered with his employment relationships with third parties.  After a thorough review of the record and the parties' briefs, and with the benefit of oral argument, we affirm the district court's grant of summary judgment.

## I

Dr. Ashkenazi is a thoracic and vascular surgeon who was born in 1939.  He had surgical privileges with the South Broward Hospital District d/b/a Memorial Healthcare System.  Pursuant to renewable contracts, he worked on-call shifts in

several emergency rooms within the District for several years.  In 2010, he was removed from the hospitals' on-call schedules.  In 2012, the District revoked his major surgical privileges and reported the revocation to the Florida Department of Health and Human Services and the Florida Board of Medical Examiners.  Dr. Ashkenazi alleged that the District took these actions against him due to his age and his participation in protected activity.

Dr. Ashkenazi sued the District, alleging age discrimination and retaliation under the ADEA and FCRA, and asserting that the District's actions "denied him opportunities for and access to employment by private patients."  The District moved for summary judgment, arguing in part that the discrimination and retaliation claims failed because Dr. Ashkenazi was not a District employee.  Even if he were an employee, the District argued that the claims failed on the merits.  Finally, the District argued that the Eleventh Circuit does not recognize a claim for interference with third-party employment under the ADEA or the FCRA.

The district court granted summary judgment in favor of the District, ruling that Dr. Ashkenazi was an independent contractor, and not an employee.  It also disagreed that Dr. Ashkenazi had shown genuine issues of material fact about the nature of his employment relationship.  Finally, the district court concluded that although the Eleventh Circuit permits Title VII claims for interference with employment relationships with third parties, Dr. Ashkenazi had not sufficiently

3

shown that he was "deprived of specific employment opportunities with third parties." Dr. Ashkenazi now appeals.

## II

"We review *de novo* the district court's order granting summary judgment." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001). All facts and reasonable inferences are viewed in the light most favorable to the non-moving party, here Dr. Ashkenazi. *See id.* Summary judgment is appropriate when no genuine issue of material fact exists. *See id.* But a fact is material "only when the dispute over it has the potential to change the outcome of the lawsuit under the governing law" if it is found in the non-movant's favor. *Zaben v. Air Prods. & Chems., Inc.*, 129 F.3d 1453, 1455 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). And a dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## III

The first issue on appeal is not the merits of the age discrimination and retaliation claims, but rather whether Dr. Ashkenazi can bring them under the ADEA and FCRA given the nature of his working relationship with the District.

"Federal case law interpreting . . . the ADEA applies to cases arising under the FCRA." *City of Hollywood v. Hogan*, 986 So. 2d 634, 641 (Fla. 4th DCA

2008).  Thus, Dr. Ashkenazi's FCRA claims—or at least his discrimination claims under the FCRA—rise or fall with the ADEA claims.

The ADEA, in relevant part, prohibits employers from "fail[ing] or refus[ing] to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  The ADEA also prohibits employers from "discriminat[ing] against any of [its] employees" because the employee "opposed any practice made unlawful by this section, or because" the employee "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter."  *Id.* § 623(d).

To seek relief under the ADEA, a plaintiff must be an employee.  *See Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488, 1495 n.13 (11th Cir. 1993) ("The ADEA does not provide relief for discrimination against an independent contractor.").  The ADEA does not provide guidance as to the scope of the term "employee," beyond defining an "employee" as " 'an individual employed by any employer.' "  *Id.* at 1495 (quoting 29 U.S.C. § 630(f)).  As explained below, three different tests are used to determine whether a person is an independent contractor or an employee under federal law.

5

First, there is the common-law agency test, which focuses on a " 'hiring party's right to control the manner and means by which the product is accomplished.' " *Id.* (quoting *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751 (1989)).  In addition to looking at control over the manner and means of the work, courts using the common-law agency test consider a number of other factors:

> "the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party."

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (1992) (quoting *Reid*, 490 U.S. at 751-52, and describing, in an ERISA case, the common-law agency test as containing the above *Reid* factors).  *See also Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 444-45 (2003) (applying the common-law agency test and *Reid* factors in an ADA case involving physician-shareholders of a professional corporation).

Second, we have used, in FLSA cases, an "economic realities" test.  *See Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 470-71 (11th Cir. 1982).

6

This test analyzes the extent to which the individual is dependent on the employer. *See Daughtrey*, 3 F.3d at 1495.

And third, "in the context of the federal employment discrimination statutes," we have used a hybrid approach. *Id.* Under the hybrid approach, we look at the common-law agency test, "tempered by a consideration of the 'economic realities' of the hired party's dependence on the hiring party." *Id. See also Cobb v. Sun Papers, Inc.*, 673 F.2d 337, 340-41 (11th Cir. 1982).

We have not expressly decided which test should be applied in ADEA cases. *See Garcia*, 104 F.3d at 1266-67 (concluding in an ADEA case that, under either the common-law agency test or the hybrid approach, the plaintiff had shown sufficient disputed facts about the amount of control the defendant exercised over his work to survive a directed verdict motion). *See also Daughtrey*, 3 F.3d at 1495-96 (concluding the same in an ADEA case and reversing in part the district court's summary-judgment order). And we do not need to do so here because Dr. Ashkenazi has failed to create a genuine issue of material fact under either the common-law agency test or the hybrid approach.

As the Fourth Circuit recognized in a Title VII case, doctors and hospitals have "a competition for control that is inherent in the duty of each to discharge properly its professional responsibility": a "doctor must have direct control to make decisions for providing medical care" and "hospital[s] must assert a degree

7

of conflicting control over every doctor's work." *Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 260 (4th Cir. 1997). *See also Wojewski v. Rapid City Reg. Hosp., Inc.*, 450 F.3d 338, 344 (8th Cir. 2006) (holding that, in an ADA and Rehabilitation Act case, an agreement's "heightened level of personal control" over a doctor was "akin to the normal tensions discussed in *Cilecek*" and merely "reasonable steps [by the hospital] to ensure patient safety and avoid professional liability while not attempting to control the manner in which [the doctor] performed operations"). The Fourth Circuit has explained that, in the context of medical professions, it is "[m]ore enlightening" to analyze "the control involved in deciding when a doctor performs his services, the number of hours he performs them, and the administrative details incident to his professional services." *Cilecek*, 115 F.3d at 260.

Based in part on a doctor's ability to control the manner in which the doctor provides his or her services, many circuits evaluating employment discrimination claims by doctors against hospitals have found that the doctors were independent contractors and not employees. *See, e.g.*, *Wojewski*, 450 F.3d at 344 (ADA & Rehabilitation Act); *Shah v. Deaconess Hosp.*, 355 F.3d 496, 500 (6th Cir. 2004) (ADEA & Title VII); *Cilecek*, 115 F.3d at 262-63 (Title VII); *Alexander v. Rush N. Shore Med. Ctr.*, 101 F.3d 487, 493 (7th Cir. 1996) (Title VII); *Diggs v. Harris Hosp.-Methodist, Inc.*, 847 F.2d 270, 272-73 (5th Cir. 1988) (Title VII). But, as

8

the Supreme Court counsels, no one factor is determinative. *See Reid*, 490 U.S. at 752. A doctor's exercise of professional judgment about a patient's medical care is not a dispositive factor in this analysis; otherwise, all physicians would be "carve[d] out, . . . as a category, from the protections of the antidiscrimination statutes." *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 228-29 (2d Cir. 2008). Indeed, in *Garcia* we previously recognized that a doctor who provided emergency room services for a Florida hospital pursuant to a contract could potentially be an employee. We held that a factual dispute existed because the doctor presented, in part, evidence that "the medical directors oversaw the medical care he provided." *Garcia*, 104 F.3d at 1267.

Thus, the important takeaway from existing precedent is that each case is factually specific and context dependent on the precise nature of the working relationship between the parties. There may be times where a factual dispute about the parties' working relationship requires a jury to determine whether the doctor is an employee or an independent contractor. At other times, the material facts may be so clear and undisputed that a reasonable jury could come to only one conclusion. This case is an example of the latter situation.

The relevant facts are these. Dr. Ashkenazi owned a corporation through which he operated his private practice. Dr. Ashkenazi determined the salary he received from the corporation, and the corporation annually issued him a Form W-

9

2 for income tax purposes.  The corporation hired, fired, and paid its employees. Dr. Ashkenazi saw his private patients at offices maintained by the corporation, and his patients and their insurance companies paid the corporation for his services.

Dr. Ashkenazi did not plead and has not argued on appeal that he was an employee of the District based on the services he provided to his private patients through his private corporation.      Instead, Dr. Ashkenazi argues that he was an employee through his provision of on-call services at several hospital emergency rooms within the District.  The services he provided during the on-call ER shifts comprised approximately 10% of his practice.

Beginning in 2006, Dr. Ashkenazi entered into written contracts with the District governing his performance.  The contracts stated: "It is expressly acknowledged by the parties hereto that [Dr. Ashkenazi] is an 'independent contractor,' and nothing in this Agreement is intended nor shall be construed to create an employer/employee relationship or partnership or joint venture arrangement."  Although not controlling, the contract affirmatively states that the parties intended to create an employer-independent contractor relationship, not one of employer-employee.  And that is a relevant factor.  *See Daughtrey*, 3 F.3d at 1492 (finding the parties' intent probative, but not decisive).

10

The parties also treated the method of payment, tax treatment, and the provision of benefits akin to an employer-independent contractor relationship. Under the contracts, the District paid Dr. Ashkenazi a flat rate—not an hourly rate—for each 24-hour on-call shift that he was available. The District did not provide Dr. Ashkenazi with any other financial benefits and issued him a Form 1099 for income tax purposes. When Dr. Ashkenazi saw ER patients on-call, his corporation—not the District—billed the patients or their insurance companies for his services. The District did not bill for services that Dr. Ashkenazi performed while providing on-call services.

The District did provide Dr. Ashkenazi with hospital facilities, support personnel, and equipment when he performed surgeries, and it billed the patients directly for the hospital staff, services, and equipment it provided. But the District's provisions of its facilities, equipment, and personnel are "inherent in the provision of emergency medical services" whether the doctor "is an employee of the hospital or simply has privileges [to use] the hospital." *Cilecek*, 115 F.3d at 262. Dr. Ashkenazi admitted that his surgical practice is the type that must be performed in a hospital setting, regardless of his actual working relationship with the District. Thus, the location of the work and the source of the instrumentalities and tools, in this case, do not shed a lot of light on the nature of the parties' working relationship.

11

It is true, as Dr. Ashkenazi points out, that the District's chief of vascular services—a non-employee physician—prepared the on-call ER schedules. But Dr. Ashkenazi had flexibility in deciding when and where he would work. For example, during any given 24-hour on-call shift, the District did not require Dr. Ashkenazi to stay on a hospital's premises. He could meet with patients at his private practice or otherwise attend to his private business unless he was actually at a hospital on a call. While on-call for one hospital, Dr. Ashkenazi could perform surgeries on his private patients—even at other hospitals—or do other work at his private office. And Dr. Ashkenazi was able to coordinate with other surgeons to cover for him if he was unable to come to a hospital during a scheduled shift. Further, the District could not assign additional patients to Dr. Ashkenazi beyond those whom he treated during his on-call shifts. Thus, the District had no right to assign additional work to Dr. Ashkenazi, and he could control when and how long he worked on-call.

Dr. Ashkenazi does not dispute these facts, but rather argues that other evidence in the record shows that he was an employee of the District. Specifically, he argues that the District counseled him to forgo limb salvage surgery in favor of amputation on elderly patients; instructed him to get second opinions on complex surgeries; subjected some of his past surgeries to a more strenuous review than the peer-review process; insisted that other doctors attend his surgeries as proctors;

stopped scheduling him for on-call emergency surgeries because he could not guarantee that a proctor would be present; instructed him to use non-physician health practitioners during surgery; required him to keep logs and other reports of the services that he provided; instructed him to attend certain continuing education events; and ultimately revoked his major surgical privileges. We disagree that this evidence creates a genuine issue of material fact.

First, the record-keeping tasks about which Dr. Ashkenazi complains are administrative tasks required by the District that in no way interfered with or controlled the manner or means by which he performed his job. These same requirements were demanded of all doctors who had privileges at the District, and as such—similar to the factors about the location of the work and the provision of tools and instrumentalities—cannot be considered requirements unique to only District employees.

Second, the instances where Dr. Ashkenazi says that the District controlled the provision of his medical services did not arise until 2008—two years after he began working as an on-call vascular surgeon for the District—and resulted from the District's additional oversight following a documented issue with his level of medical care. There is no record evidence that the District exerted any similar "control" over Dr. Ashkenazi prior to its efforts to closely monitor his cases to protect its patients' well-being and itself from liability.

In fact-specific and context-dependent cases such as this one, we must examine the parties' working relationship in its basic form.  Taking the record facts in the light most favorable to Dr. Ashkenazi, the District did not "transform" the working relationship into one of employer-employee by requiring him to perform surgeries only with proctors, attend certain national conferences covering surgical techniques, and stop performing limb salvage surgeries with high risks of failure on elderly patients.  Rather, these efforts to "control" Dr. Ashkenazi were the hospital district's "reasonable steps . . . to ensure patient safety and avoid professional liability."  *See Wojewski*, 450 F.3d at 344.  The record evidence indicates that the proctors were present only if something went wrong, or if Dr. Ashkenazi wanted a second opinion.  They did not speak with patients or instruct Dr. Ashkenazi as to the medical decisions he should make.  Further, the record shows that Dr. Ashkenazi scheduled his own proctors.  Dr. Ashkenazi was not forced to use certain medical professionals as proctors who attempted to "reeducate[e]" him or mentor him on how to perform the surgeries differently than he ordinarily would.  *Cf. Salamon*, 514 F.3d at 224-25, 229-31 (reversing district court's summary-judgment order in favor of hospital which had created a "reeducation" program designed to change a doctor's medical decisions, because the program was not motivated by statutory requirements, but instead an effort to

14

maximize the hospital's revenue and punish the doctor for complaining about harassment).

Finally, Dr. Ashkenazi argues that our prior holding in *Garcia* compels us to reverse the district court's grant of summary judgment in favor of the District and remand his case for trial. In *Garcia*, 104 F.3d at 1258, we reversed a district court's ruling that a doctor was an independent contractor and not an employee. Although the doctor in *Garcia* also had a contract with a hospital that specified the parties' working relationship as that of employer-independent contractor, *Garcia* does not mandate reversal here.

*Garcia* was on appeal from the district court's dismissal for lack of subject-matter jurisdiction. The district court had held that the defendant was not an "employer" because it counted emergency room doctors as "independent contractors," and not as employees. Our task was to determine whether a judge, as opposed to a jury, should determine on the record before us whether the defendant was an employer under the ADEA. We held that whether or not a defendant is an employer is an element of an ADEA claim, and thus, it should be resolved by the jury. *Garcia*, 104 F.3d at 1258.

Notably, the judge in *Garcia* who erroneously dismissed the case had previously denied summary judgment, concluding that questions of fact existed as to whether Dr. Garcia was an employee or an independent contractor. *Id.* at 1259.

15

Although *Garcia* does not give us an exhaustive description of the evidence, some of the evidence indicated that the "medical directors oversaw the medical care [Dr. Garcia] provided, scheduled his shifts and paid him on an hourly basis." *Id.* at 1267. Here, there is no disputed issue of material fact about the level of control the District had over Dr. Ashkenazi. On this record, we affirm the district court's grant of summary judgment.

## IV

Dr. Ashkenazi also argues that, even if he is an independent contractor as a matter of law, the FCRA permits retaliation claims by independent contractors who complain about discrimination. Florida courts have held that FCRA retaliation claims generally follow federal case law, but the plain language of the FCRA and ADEA retaliation provisions differ. *Compare* Fla. Stat. § 760.10(7) (stating that it is unlawful to retaliate against "any person"), *and id.* § 760.02(6) (defining a "person" under the FCRA as including "individual[s]"), *with* 29 U.S.C. § 623(d) (specifically protecting, as applicable in this context, only "employees or applicants for employment"). *See also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009) ("[W]e must be careful not to apply rules applicable under one statute to a different statute without careful and critical examination." (internal quotation marks and citation omitted)).

16

We are not aware of any Florida appellate case that expressly construes the FCRA's "any person" language in age-based retaliation claims as pertaining to only employees, and not independent contractors. And we have never adopted a categorical rule that the scope of the entire FCRA is identical to the ADEA, such that a person must be an employee to proceed in an age-based FCRA retaliation suit. We decline to pass on this question today.

Here, Dr. Ashkenazi's state law retaliation claim against the District is barred not by the FCRA's language, but rather by another Florida statute which grants immunity to its hospital districts for suits arising out of their peer review and credentialing processes:

> There shall be no monetary liability on the part of, and no cause of action for injunctive relief or damages shall arise against, any licensed facility, its governing board or governing board members, medical staff, or disciplinary board or against its agents, investigators, witnesses, or employees, or against any other person, for any action arising out of or related to carrying out the provisions of this section, absent intentional fraud.

Fla. Stat. § 395.0191(7). *See Lawnwood Med. Ctr., Inc. v. Desai*, 54 So. 3d 1027, 1030 (Fla. 4th DCA 2011) ("Absent specific allegations of intentional fraud, [the statute's] immunity protects the hospital."). The parties do not dispute that Dr. Ashkenazi's claims arose out of the processes covered by § 395.0191. As a result, Dr. Ashkenazi's retaliation claim is barred.

Dr. Ashkenasi argues that § 395.0191 is modeled after a federal statute that exempts similar professional-review actions from immunity under a number of federal civil rights statutes. *See* 42 U.S.C. § 11111. But we must apply the plain language of § 395.0191, as written and enacted by the Florida Legislature and as interpreted by the Florida courts, and not the language of a separate federal statute that was enacted by an entirely different legislative body.

Dr. Ashkenazi also contends that he sufficiently pled "intentional fraud" because he alleged that two doctors used the hospital credentialing process to get rid of him (in essence articulating a "cat's paw" theory of liability). The problem is that Dr. Ashkenazi's second amended complaint fails to allege that the District made a misrepresentation about a material fact that it knew to be false. Thus, Dr. Ashkenazi did not sufficiently plead intentional fraud, and his FCRA age-based retaliation suit is barred by § 395.0191(7).

## V

Dr. Ashkenazi next argues that the district court erred in holding that he had not sufficiently shown that the District interfered with his employment opportunities by third parties (i.e., a potential business arrangement with Dr. Feldbaum, and employment by his private patients). The district court granted summary judgment on this claim because it concluded that Dr. Ashkenazi showed he had only preliminary discussions with Dr. Feldbaum about "a possible business

arrangement," and there was no "existing, or even reasonably certain, employment relationship between [Dr.] Ashkenazi and another party." The district court also ruled that Dr. Ashkenazi could not proceed with this claim with regard to his private patients because "a patient is not a doctor's employer." Though we analyze this claim somewhat differently than the district court, we agree with its ultimate conclusion that summary judgment was proper.

We have never decided whether a plaintiff can bring a legally-cognizable claim under the ADEA for interference with employment opportunities with third parties. We have, however, recognized that such a claim is possible under Title VII. *See Pardazi v. Cullman Med. Ctr.*, 838 F.2d 1155, 1156 (11th Cir. 1988) (reversing the district court's grant of summary judgment and holding that Title VII protections "extend to a claim that a defendant has interfered with an individual's employment relationship with a third party"). We need not decide this issue today, because even if such a claim were legally cognizable under the ADEA or the FCRA, Dr. Ashkenazi's claim fails on the merits.

First, Dr. Ashkenazi cannot prevail on his claim that the District interfered with an employment relationship with Dr. Feldbaum. For one thing, his second amended complaint is silent about any employment relationship he had or might have had with Dr. Feldbaum. Instead, the complaint alleges only that the District denied Dr. Ashkenazi the opportunity for employment by "private patients."

19

Moreover, the record does not show that Dr. Ashkenazi raised this theory prior to his summary-judgment response. *See Lightfoot v. Henry Cnty. Sch. Dist.*, 771 F.3d 764, 779 (11th Cir. 2014) (holding that a "district court did not err in declining to consider [a] new factual basis [for an existing claim] when it was raised in [the plaintiff's] opposition to summary judgment").

Even if we assume that Dr. Ashkenazi properly raised the interference claim concerning Dr. Feldbaum, the claim still fails. *Pardazi*, our Title VII case recognizing the viability of interference claims, involved a hospital's denial of staff privileges that allegedly interfered with a doctor's employment contract with an Alabama corporation. *Pardazi*, 838 F.2d at 1156. Here, Dr. Ashkenazi had no employment contract with Dr. Feldbaum, and he offered no evidence beyond speculation about entering a possible employment relationship with Dr. Feldbaum. Because Dr. Ashkenazi cannot show that the District interfered with an actual, specific employment relationship, the district court correctly granted summary judgment on this claim.

Second, Dr. Ashkenazi cannot prevail on his claim with regard to his private patients. We have previously extended Title VII protection to interference claims based on *employment* relationships with third parties. *See id.* But we expressly declined to decide whether a plaintiff could bring an interference claim despite the absence of any employer-employee relationship at all. *See id.* at 1156 n.1.

Although some courts have recognized such a claim, *see id.* (listing cases), other courts have required at least "some connection with an employment relationship for Title VII protections to apply," *Mitchell v. Frank R. Howard Mem. Hosp.*, 853 F.2d 762, 767 (9th Cir. 1988).

In Title VII cases where a doctor has claimed that patients were his employers, at least five circuit courts have rejected the claims because patients do not control the manner and means by which a doctor performs his services. *See Salamon*, 514 F.3d at 233; *Bender v. Suburban Hosp., Inc.*, 159 F.3d 186, 190 (4th Cir. 1998); *Alexander*, 101 F.3d at 493 n. 2; *Mitchell*, 853 F.2d at 767; *Diggs*, 847 F.2d at 274.  Further, even if an ADEA interference claim did not require evidence of an employer-employee relationship, the claim nonetheless fails.  Dr. Ashkenazi specifically alleged that he was "denied . . . opportunities for and access to employment by private patients," and his argument depends upon us equating the hospitals' emergency room intake procedure to an employment agency and the patients referred by the hospital to employers.  Without deciding whether we would recognize interference claims under the ADEA, we hold that in the traditional doctor-patient relationship, patients are not doctors' employers under federal discrimination statutes like the ADEA.  Thus, Dr. Ashkenazi's claim fails.

## VI

We affirm the district court's grant of summary judgment in favor of the District.

**AFFIRMED.**