In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-3774

YELENA LEVITIN and
CHICAGO SURGICAL CLINIC, LTD.,

*Plaintiffs-Appellants,*

*v.*

NORTHWEST COMMUNITY HOSPITAL, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 C 5553 — **Gary Feinerman**, *Judge.*

ARGUED DECEMBER 3, 2018 — DECIDED MAY 8, 2019

Before SYKES, BARRETT, and ST. EVE, *Circuit Judges.*

SYKES, *Circuit Judge.* For nearly thirteen years, Dr. Yelena Levitin performed surgeries at Northwest Community Hospital in Arlington Heights, Illinois. In January 2013 the hospital terminated her practice privileges. She brought this Title VII suit claiming that Northwest discriminated against her based on her sex, religion (Jewish), and ethnicity (Russian). The hospital responded that Levitin wasn't its

employee, precluding her Title VII claim. The district judge agreed and entered summary judgment for Northwest.

We affirm. There is no genuine dispute here. Levitin was an independent physician with practice privileges at the hospital. She was not the hospital's employee.

## I. Background

Levitin is a female, Jewish surgeon of Russian descent. She owns and operates Chicago Surgical Clinic, Ltd., a private medical practice. From 2000 through early 2013, most of her revenue came from the work she performed at Northwest, where she maintained practice privileges.

In December 2008 Levitin complained to Northwest that Dr. Daniel Conway, another surgeon, was harassing her. She alleges that Conway repeatedly criticized her medical decisions, undermined her in front of her patients, and interrupted one of her surgeries. Northwest reprimanded Conway, and any direct harassment stopped in January 2009.

But Levitin's relationship with Northwest and its staff remained uneasy. At least four doctors filed complaints concerning her professional judgment. One refused to work with her entirely. And another, the head of pathology, complained that Levitin habitually requested inappropriate tests from his department. In response to these complaints, Dr. William Soper, then the chair of Northwest's surgery department, informed Levitin that he would begin proactively reviewing the surgeries she scheduled for potential issues.

Soper also reviewed Levitin's prior surgeries. He referred 31 cases to the Medical Executive Committee, which oversees physician credentialing at Northwest. The committee

found that Levitin deviated from the appropriate standard of care in four of these cases. The committee initially concluded that Levitin should receive quarterly reviews, but it reconvened following an incident in which Levitin operated on a patient without proper sedation. This time the committee voted to terminate her practice privileges.

Levitin viewed the committee proceedings as retaliation for her complaints against Conway. Alleging as much, she appealed the committee's decision through two intermediate levels of internal review. Her case eventually came before Northwest's Board of Directors, which held final authority over termination decisions. In January 2013 the Board terminated Levitin's practice privileges.

Seven months later Levitin filed a 14-count federal complaint against Northwest; Drs. Loren, Soper, and Conway; and Advanced Surgical Associates, S.C. (their practice group). The sprawling suit raised antitrust claims, state-law claims, and a claim for employment discrimination based on sex, religion, and ethnicity in violation of Title VII of the Civil Rights Act of 1964. The district judge dismissed the antitrust claims early on but allowed the Title VII and state-law claims to proceed. At summary judgment the judge determined that the undisputed evidence showed that Levitin was not a Northwest employee, which put her discrimination claim outside of Title VII's scope. The judge relinquished supplemental jurisdiction over the state-law claims and entered final judgment, setting up this appeal, which concerns only the Title VII claim.

## II. Discussion

We review a summary judgment de novo. *Kopplin v. Wisc. Cent. Ltd.*, 914 F.3d 1099, 1102 (7th Cir. 2019). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

The sole question on appeal is whether Levitin was a Northwest employee for purposes of Title VII. Because the statute protects only employees, *see* 42 U.S.C. § 2000e-3, Levitin's discrimination claim turns on this threshold inquiry. Title VII does not provide much guidance: It defines "employee" as "an individual employed by an employer," *id.* § 2000e(f), and an "employer" is simply a "person … who has fifteen or more employees" for a set period of time, *id.* § 2000e(b). We've noted before that these definitions are "completely circular" and do not meaningfully define "employee." *Smith v. Castaways Family Diner*, 453 F.3d 971, 976 (7th Cir. 2006) (quotation marks omitted).

The inquiry thus rests on agency law, which looks "to the economic realities of the relationship and the degree of control the employer exercises over the alleged employee." *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 380 (7th Cir. 1991) (quotation marks omitted). Relying on agency principles, we held in *Knight* that the following factors are relevant:

> (1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work; (2) the kind of occupation and nature of skill required, including whether skills are obtained

in the workplace; (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations; (4) method and form of payment and benefits; and (5) length of job commitment and/or expectations.

*Id.* at 378–39. "[T]he employer's right to control is the most important" of these factors. *Id.* at 378.

Applying the *Knight* factors, we have repeatedly held that a physician with hospital practice privileges is not the hospital's employee merely because he is subject to peer review. *See Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 805–06 (7th Cir. 1999); *Alexander v. Rush N. Shore Med. Ctr.*, 101 F.3d 487, 492–93 (7th Cir. 1996); *see also Hojnacki v. Klein-Acosta*, 285 F.3d 544, 552 (7th Cir. 2002). Still, we've said that "it could be argued that a physician who enjoys hospital staff privileges does, under certain factual situations, share an indirect employer-employee relationship with the hospital sufficient to invoke Title VII protection." *Alexander*, 101 F.3d at 492. Levitin sees a path to Title VII coverage in this passing speculation. Not so. In *Alexander* we ultimately held that the plaintiff-physician was not a hospital employee, and Levitin's case is materially indistinguishable.

Like the plaintiff in *Alexander*, Levitin owned her own medical practice, billed her patients directly, and filed taxes as a self-employed physician. Northwest did not provide Levitin with employment benefits or pay her professional-licensing dues. Moreover, Levitin's work agreement with Northwest confirms her independence. She could set her own hours, subject only to operating-room availability; she could obtain practice privileges at other hospitals and redi-

rect her patients to those locations; and she could use her own staff in surgeries. Most importantly, she made the treatment decisions for her patients.

To be sure, Northwest placed certain restrictions on Levitin. But they were no more onerous than those in *Alexander*, which involved nearly identical on-call demands, medical-education standards, peer-review processes, and reporting requirements. Indeed, we have rejected claims of employment when physicians had even less flexibility. *See id.* at 493 (plaintiff couldn't use his own staff and the hospital assigned most patients); *Vakharia*, 190 F.3d at 805 (plaintiff couldn't associate with other hospitals); *Hojnacki*, 285 F.3d at 551 (administrators told plaintiff "how often to perform physical examinations" and "what kind of questions to ask"). "For an employer-employee relationship to exist, … the employer must have 'the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved … .'" *Hojnacki*, 285 F.3d at 551 (quoting *Alexander*, 101 F.3d at 493). Northwest exercised no such control over Levitin.

Perhaps recognizing the obvious similarities of her case with *Alexander*, Levitin argues that her evidence that Northwest's peer-review proceedings were discriminatory *as to her* creates a factual dispute over her employee status. As she sees it, when peer-review inquiries "go beyond merely adhering to professional and regulatory standards," they can generate enough control to create an employer-employee relationship. She maintains that if Northwest's peer-review proceeding against her was a retaliatory sham, then it neces-

sarily exceeded those standards and could create an employment relationship.

There's no support for this novel theory. As a threshold matter, it's unclear that a particular peer-review proceeding has any relevance to the *Knight* factors. The most important factor for determining employment status is an "employer's right to control." *Knight*, 950 F.2d at 378. The right to control an employee generally comes from contractual and other workplace terms that govern the parties' relationship, not an isolated peer-review proceeding. *See NLRB v. Sachs*, 503 F.2d 1229, 1233 (7th Cir. 1974) ("It is, of course, the right to control and not the actual exercise of that right which is the decisive element."). In *Vakharia*, for example, we rejected a physician's claim that a hospital exerted control through sham peer-review proceedings because the terms of the parties' agreement contemplated an independent-contractor relationship. 190 F.3d at 805–06; *see also Alexander*, 101 F.3d at 493 (focusing the right-to-control analysis on the formal terms governing the physician-hospital relationship); *Shah v. Deaconess Hosp.*, 355 F.3d 496, 500 (6th Cir. 2004) (holding that enforcing a standard of care "after the fact, through the peer review process," is not indicative of control for Title VII).

To overcome the force of this contrary precedent, Levitin relies heavily on the Second Circuit's decision in *Salamon v. Our Lady of Victory Hospital*, 514 F.3d 217 (2d Cir. 2008). There the court allowed a Title VII case to proceed where the plaintiff-physician claimed that the hospital peer-review committee retaliated against her for complaining about sexual harassment by subjecting her to an onerous "quality assurance program." *Id.* at 222–25. The plaintiff characterized the program as a system of "continuing surveillance"

and a "reeducation program" that gave the hospital control over all of her treatment decisions. *Id.* at 229–31.

Nothing similar happened here. In any event, *Alexander* is the controlling precedent in our circuit, and Levitin has not meaningfully distinguished her case from it. Moreover, under *Knight* it's irrelevant whether a peer-review proceeding falls short of, meets, or exceeds the requirements of professional or regulatory standards. Compliance with regulatory or statutory requirements does not establish control for Title VII purposes. *See EEOC v. N. Knox Sch. Corp.*, 154 F.3d 744, 748 (7th Cir. 1998) ("[S]tate regulations reflect no 'control' by … the putative employer here.").

So we return to where we started: Levitin's case is materially indistinguishable from *Alexander*. She was not an employee of Northwest, which precludes her Title VII claim. Accordingly, the judgment of the district court is

AFFIRMED.